MICHAEL RIZZOLO v. THE COMMONWEALTH.

ERROR TO THE COURT OF OYER AND TERMINER OF LUZERNE COUNTY.

Argued April 15, 1889—Decided April 29, 1889.
[To be reported.]

1. An indictment for murder was found a true bill on January 9th, set down for trial on January 29th, and on that date continued on the prisoner's application. When called for trial on February 7th, the prisoner petitioned for a change of venue on the ground of alleged excitement and prejudice against him, and for a rule to take testimony. The court, offering to hear the testimony at bar, and the prisoner producing none, it was not error to dismiss the application.

2. It appeared that the list of names certified to have been drawn and placed in the jury wheel for the year, by the jury commissioners, contained four names more than the order of court specified. In such case, if by mere accident the wheel contained too many names, it was a harmless irregularity which furnished no ground for quashing the indictment or the array of jurors.

3. Where jurors, challenged for cause by the prisoner, had all formed opinions of his guilt or innocence from what they had read of the matter in the newspapers, but all testified that they could render a verdict

according to the evidence, uninfluenced by their previously formed opinions, it was not error to overrule the challenges.

4. The prisoner was told by a subordinate detective that "he had better tell the captain all he knew, and it would be better for him;" afterwards, having been fully cautioned by the subordinate's chief, the latter telling him, "I can make you no promise, . . . . . anything you say to me I shall use against you," made a full confession: in such case, the confession was admissible in evidence.

5. The jury having returned a verdict that the prisoner was guilty of murder of the first degree, as the only judgment which could be passed was sentence of death, a record showing that the prisoner was called to the bar, and asked if he had "anything to say why sentence should not be pronounced against him," was sufficient in this respect to sustain judgment.

Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS and MITCHELL, JJ.

No. 412 January Term 1889, Sup. Ct.; court below, No. 165 January Term 1889, Q. S. cert. to O. and T.

On January 9, 1889, the grand jury returned as a true bill an indictment charging Michael Rizzolo with the murder of Bernard McClure and Hugh Flanigan, employees of Charles McFadden, a railroad contractor, on October 19, 1888, upon a mountain road about two miles from the village of Miner's Mills. The prisoner had been arrested and committed on January 3d. The case was set down for trial on January 29th, when at the request of the defendant it was continued to February 6th, and then again continued to the next day.

At the trial on February 7, 1889, the counsel for the prisoner moved for a change of venue, alleging as ground thereof the great excitement and prejudice against him in Luzerne county, and asked for a rule to take the testimony of witnesses. The court refused to grant the rule to take testimony, but offered to hear at bar any testimony in support of the petition. No testimony was offered and the motion was refused.[1][2]

Counsel for the prisoner then filed motions to quash the array of jurors for the term, and also the indictment, the ground alleged in support of the motions being that, while the order of the court for filling the jury wheel for the year 1889 specified 1550 as the number of names to be placed therein, yet, as shown by the testimony of a witness who had counted the names on the list, the names so placed in the wheel aggre-

gated 1554. One of the jury commissioners, producing the certified list of names, testified that the intention of the commissioners was to place 1550 names in the wheel; that they did so place that number in the wheel, as certified on said list, and that they had no knowledge that four additional names had been put in. The motions were refused.[3] [4]

Certain jurors were called, who stated on their examination that they had formed opinions concerning the guilt or innocence of the prisoner from what they had read in the newspapers about the murder, but all said they could render a verdict upon the evidence uninfluenced by such opinions. The challenges were all overruled and the jurors were sworn.[5]

The commonwealth offered in evidence a confession alleged to have been made orally to R. J. Linden, at Philadelphia, taken down by a stenographer, transcribed and mailed to Wilkes-Barre, and there signed by the prisoner. It was objected, on the part of the prisoner, that the confession offered was preceded by an engagement on the part of one Thayer, a subordinate of Linden, that the prisoner should be protected both from punishment by the law and from the vengeance of Bevivino, implicated by the confession as the guilty actor; that Thayer had said to the accused after his arrest and being brought before the chief, "that he had better tell the captain all he knew and it would be better for him." It was shown on the part of the commonwealth that, before giving his confession, the prisoner had been fully cautioned by Linden and told that anything he said would be used against him. The objection was overruled, and the offer admitted.[6] [7]

The facts of the case sufficiently appear from the charge of the court, RICE P. J., which after general instructions defining the crime of murder at common law and under the statute, proceeded:

Now, gentlemen of the jury, having thus stated the general principles which govern the consideration of the different grades of crime which are included in this indictment, I call your attention briefly to some of the facts which we think it is safe to say are undisputed, or at least which are proved by testimony which is not contradicted.

It would appear that on the morning of the 19th of October,

Bernard McClure and Hugh Flanigan started from the works of Mr. McFadden, above Miner's Mills, to come to Wilkes-Barre, for the purpose of getting money to pay the men employed at those works. They went to the Wyoming National Bank, and there obtained twelve thousand dollars in money, largely paper money, and also some silver and smaller coin. This was put in a satchel, and they started upon their return. They stopped for a moment at Miner's Mills, at the post-office, and then started up the road which has been described to you by the witnesses. Mr. McFadden that same morning started down the road for the purpose of coming to Wilkes-Barre. On his way down a short distance, which has been described to you by the witnesses, above what is called the White House road, he found his horse standing in the road, and upon examination found the dead body of Bernard McClure under the wheel. He made no further examination at that time, apparently, but returned to his work, and having got his superintendent they again returned to this scene. They then found, about 500 feet below where McClure lay, the body of Flanigan, he also being dead, having been shot. The money that had been in the wagon was gone. The horse had been shot. The physicians have described to you the wounds which McClure received. They have also produced two bullets which were taken out of his body. They have described the third wound in the head, and have testified that either one of these would have been fatal. These circumstances would be very strong evidence that not only the crime of robbery, but the crime of murder had been committed.

There is only one person who has given direct testimony as to what took place at that time, as to the circumstances surrounding that transaction, and that is the defendant. And for the purpose of bringing before your minds the circumstances of the killing, I will read an extract from the confession which he is alleged to have made to Capt. Linden, and then also an extract from the testimony which he gave upon the stand here. Speaking of McClure and Flanigan he says:

"When I got close to the forks of the road, McClure and Flanigan passed me, but I did not speak to them. When they got to the little hill they went slow and I followed them. I see Bevivino come out and shoot from the bushes. He shot

Charge of Court below.

McClure twice in the back; then he shot the other man, but I didn't think he hit him. Then Vallillo came up in front of them and shot the other man twice in the face. I had a revolver in my hand and was running after them. The horse run away and McClure was hanging with his feet under the wheel. When they had gone about twenty or thirty yards the old man fell out and Vallillo ran away down the road, and Bevivino looked at me mad, and told me to come. I went with him and when they got to the place where they afterward found the horse he stopped, and then Bevivino shot the horse and shot McClure again in the head. He then shot a good many times at the horse. I was standing still and he cursed me and got very white and said: 'Here, you hold this gun and if anybody comes you kill them.' I held it, and with the knife he cut the straps that held the valise to the buggy, then put the valise on his shoulders and said: 'Let us go through here.' It was raining and muddy and we went up and took the money and hid it a couple of miles from the scene of the murder; also the gun."

In the same connection I read to you the testimony that he gave here upon the stand, as taken down by the stenographer.

"When I got to this place they passed me." Q. "Who passed you?" A. "Mr. McClure and Flanigan, they passed me. When they passed me I suppose the old man spoke and he says, 'How do you do?' I say, 'How do you do?' When they passed I walk with him, that is, the buggy was going not on a trot but pretty lively; and they got away from me—well, here to that officer out to the front door, little closer than that. When I got there I was walking, I had an umbrella in my hand; I seen Bevivino come out of the bush and shot McClure once; after, he shot twice, I think, or three times, and McClure first. He was standing on the other side of the buggy, standing on the right side going up. After he shot McClure, McClure fell; he stood a little while and then fell on the side. After he fell he shot the other man; he shot him two or three times; this here Flanigan, he stands, then he falls. After a little while the horse got scared and the time he shot the first time he looks at me, and that is the time he cursed me to follow him, when he looked at me; this here Flanigan was living yet, I suppose; I don't know; but he was hanging after he spoke to me and cursed me."

Charge of Court below.

Q. " Who cursed you? What did he say, how did he curse you?" A. " He cursed me, you know." Q. " What did he have in his hand?" A. " He had a rifle." Q. " How did he have it pointed?" A. " He didn't have it pointed; he just look at me and look at me. So after he cursed me, you know "—

Q. " Tell what he said, how he cursed?" A. "He says J—— C——, hurry up. He looked at me and he got kind of white. After he got white, you see I thought the man—After he says that, I got scared from the way he spoke to me three or four days ago, that the man who would lose his courage he would got killed; that what made me pull out the revolver, and I shot three or four times while the horse was running, mind. The horse was running and those people they was most hanging pretty near dead; I don't know whether they were or not."

Q. " What distance were they away at the time you shot?" A. " They got a little farther; because the horse got scared." Q. " Go on." A. " When he was shot this here Vallillo he come out and shot in front, and after that they got scared and run away. This old man he fell. I walked slow and he runs. He turns back again but he didn't tell me anything after he "—

Q. " Who turns back and looked at you?" A. " Bevivino. He turns and looked at me; he didn't say anything at all but he was running; he was out of wind, I suppose. After he got to the place where the horse was found he went to work and shot the horse. After he shot the horse he went to work shot McClure head after he was dead. Then he told me—he go to work, he pulls out a knife, small pocket knife, he cuts the strap and take this here what you call the satchel. After he take the satchel he give me the rifle; he says, ' Mike, take this and shoot whoever comes.' I could not say anything; I could not hardly speak. We went across the road and we went to the place where the gun was hided."

Now, gentlemen of the jury, under this testimony as to the circumstances of the death of Bernard McClure, and the testimony of the defendant as to how that took place, we have no hesitation in saying to you that according to all of the testimony, the killing of Bernard McClure was murder. It was murder of the first degree, because the killing was done by the persons lying in wait. It was murder in the first degree, because it

Charge of Court below.

was done in the perpetration of the felony of robbery; it was murder in the first degree because it was a wilful, deliberate, premeditated killing.

Was the defendant responsible either as a principal or as an accessory to that crime? That is the issue which you have been sworn to try, and that is the issue to which your attention has been ably and eloquently directed by the counsel on both sides of the case. According to his own testimony, he was present. According to his own testimony, he fired several shots with the revolver which he claims he had. According to his own testimony, he held the gun while Bevivino took the satchel containing the money. According to his own testimony, he went with Bevivino to the place where it was hid, and on two subsequent occasions went to the same place and took a portion of the money. Now, gentlemen of the jury, we say to you that if this testimony be believed—it is his own—then his acts if unexplained, would make him a principal, notwithstanding you were not satisfied that any of the shots fired by him caused the death of Bernard McClure.

There has been considerable argument upon the one side and the other as to whether or not the defendant was the instigator or promoter, or first suggestor of this crime. We do not regard that as an essential fact to be found. If he was there voluntarily aiding and abetting in the commission of the crime, although it was suggested and instigated by another, he would be a principal, and would be responsible in the eye of the law along with the others. The difference in the moral guilt between the parties would be one which the law would not recognize.

&ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;     &ast;

With these general principles in view we now advert to what we said as to the effect of the defendant's admitted presence and acts. And we repeat, that, unexplained, they would be sufficient to warrant a jury in inferring and finding that he was a principal, notwithstanding none of the shots fired by him had a fatal effect.

[What is the explanation? It is contended upon the part of the defendant, that he did not know the crime was to be committed on that day, and that he came upon the scene unawares; that he was not a free agent, but that he was coerced into what he did by fear of Bevivino and his alleged friends. This

defence is to be considered in two aspects.   In the first place, if you should find as a matter of fact from all of the testimony in the cause, beyond a reasonable doubt, that the fatal shots were fired by the defendant, then the fact that he was acting under the fear of Bevivino would not excuse or justify this act. Because, while a man may take the life of his assailant for the purpose of preventing the infliction of grevious bodily harm upon himself, or for the purpose of preserving his life, there is no principle of law which would justify or excuse him in taking the life of an innocent person in order to protect himself.] [8] [But in case you should find as a matter of fact that the fatal shots were not inflicted by the defendant, then you will inquire whether or not the acts which he performed there were coerced by fear of Bevivino; whether that explanation which has been given by the defendant is such as would show that he had not the power to form the wilful, deliberate and premeditated intent to take the life of McClure.] [9]

Now, gentlemen of the jury, we do not mean to prejudice your minds against the theory which has been set up here by the defendant.   It has been presented to you with great power and ability and eloquence by his counsel, and we say to you we do not purpose to interfere with your convictions upon this question of fact.   It is our duty, however, we think, to call your attention to all of the circumstances surrounding the transaction, and to ask you to scrutinize this allegation carefully, coolly, impartially.

As has been stated to you, the defendant, while a competent witness under the law, is a man deeply interested in the result of your deliberations.   So great was such interest of a person accused of this crime considered to be, that during all the history of the English common law, and of our own common law, until a very few years ago, he was not permitted to testify, because it was feared that the temptation to perjury was so great as to unfit him to be a truthful witness.   We think that the law as it is at present is much wiser.   There may be cases where a man, though charged with a crime of this nature, may explain the circumstances in such a way as to convince the mind of the jury of the truthfulness of his testimony, and in such a case he ought to have the opportunity of so doing, because the jury are competent to judge, notwithstanding his interest, whether

his testimony accords with the disinterested testimony in the case.

I call your attention in the consideration of this theory, to the circumstances as they occurred at the time, and as they have been explained by the defendant himself, leaving out of view for the present, the confessions which it is alleged he made, and the statements which it it alleged he made before the commission of the crime.

[Upon this question as to whether or not he was acting under duress and fear of Bevivino, and therefore not capable of forming a wilful and premeditated intent to take the life of McClure, I call your attention to his age. I call your attention to the power of will, to the courage, to the intelligence of the man, as exhibited by himself while upon the witness stand, and as shown by the testimony of other witnesses. All of these things are to be considered in determining as to whether or not he was acting under duress. I call your attention also, as to what threats were made at the time. Does the evidence show—does the defendant's own evidence show—that there were such threats made at the time, in connection with what had transpired before, as led him as a reasonable creature to presume or fear that his own life or limb was in danger if he did not participate in the crime? These are questions of fact for the jury. I am expressing no opinion upon them, but I am calling them to your attention and consideration. You will take into consideration the place where this occurred. Is has been argued that the defendant was going by an unusual road; that is to say, that he should have turned off to the right at the White House road, instead of continuing to follow McClure and Flanigan by the other road. You have heard his explanation as to that. He says his intention was to go first to his mother, before going to the shanty. I call your attention to the evidence as to the number of shots fired by him, and as to the direction in which they were fired, and as to the aim which was taken by him, if any. I call your attention also to the testimony as to the distance between the point where he says he first saw Bevivino and the point where the horse stood when the money was taken out of the wagon. Was he in going to that point—traversing that distance—acting under the coercion or dominating will of Bevivino, and in fear that unless he did so he would

be in danger of loss of life or of limb himself? I call your attention also to his testimony to the effect that while the money was being taken from the wagon he held the gun with which the firing had been done. Was he then acting under coercion? Was he then, as a reasonable man, in reasonable apprehension of danger to himself in case he should not continue to assist Bevivino in his conduct?] [10]

Now, I repeat, gentlemen of the jury, that while I deem it my duty to call your attention to these various circumstances, distinctly, I am not expressing any opinion; I am not trying to thrust indirectly into the jury box any opinion of my own. . . . .

Now, gentlemen of the jury, having called your attention to the circumstances which occurred at the time, as shown by the uncontradicted testimony in the cause, and as shown by the defendant's testimony either here or elsewhere, I call your attention to the other circumstances in the case from which it is claimed upon the part of the commonwealth that this crime was planned beforehand, and that the defendant was a willing member of the combination which formed this plan.

According to the defendant's own testimony and admission, he knew from the declarations of Bevivino that this crime was contemplated. He says that when it was first mentioned he thought it was a joke; but that the second time it was mentioned and thereafter, he appreciated that Bevivino was in earnest. You have heard the reason which he has given for not making known his knowledge. He says that it was by reason of threats which Bevivino made that either he or his friends would make away with him in case he should reveal the secret. That is for your consideration as explaining the fact that, possessing this knowledge that the crime was contemplated, he yet made no complaint to the officers of the law and gave no warning to the men against whom it was contemplated. [I call your attention to the testimony with regard to the purchase of the gun which has been offered in evidence. I do not purpose to go over that testimony in detail. But does the testimony show that it was done with a knowledge of the purpose to which it was to be put, on the part of the defendant?] [11] I call your attention to the testimony of Antonio Napalillo as to the declarations which he alleges were made by

Charge of Court below.

the defendant to him; and here there is a conflict of evidence; not an absolute conflict in all particulars, but a conflict in a material particular. Both Napalillo and the defendant agree in saying that the plan of murdering and robbing McClure was suggested to Napalillo. Both of these witnesses—that is Napalillo and the defendant—agree that Napalillo declined to have anything to do with it. Napalillo testifies, however, in effect that not only Bevivino, but also the defendant approached him for the purpose of inducing him to join the conspiracy, and made certain threats as to what would be done in case he should betray them. On the part of the defendant, he testifies that he never gave his assent to the undertaking, but that always when he gave a definite answer to Bevivino, it was to the effect that he could not do it. You will endeavor to reconcile the testimony of the witnesses if possible. You are to take into consideration in weighing their testimony, the interest which they may have in the case. You are to consider in the defendant's case the interest which he has in your verdict. You will consider in Napalillo's case whether or not he is testifying as he does in order to shield himself from punishment. You are to take into consideration the manner of the testimony, the impression which the witnesses make upon your mind, as to being truthful and candid, or otherwise; and it is for you to decide what is the truth with regard to any disputed question of fact. For if the testimony be believed, and there be no reasonable doubt in your mind as to its truthfulness, that the defendant did make to Napalillo the proposition which he says defendant did, and accompanied it with threats which he says he did, that would be entirely inconsistent with the theory of the defendant upon the trial, that he was coerced into this by fear of Bevivino.

In considering this allegation as to the defendant being under duress, I call your attention to the testimony of the defendant as to the nature of the threats. Is there any evidence that he was threatened by any person except Bevivino? He says that he was threatened by Bevivino that he would be killed or put out of the way either by Bevivino, or his friends, or the members of the society to which he belonged, in case he should lose his courage and not do his part, or words to that effect. [Is there any evidence in the case of knowledge upon

the part of the defendant that Bevivino had such friends, or that he was a member of such a society, or that such would be the result, etc., except the statement which he says Bevivino made to him?] [12] The point that I desire to call to your attention is this: In considering whether or not the defendant was acting under duress by reason of threats which Bevivino had made, it is important for you to consider what was Bevivino's ability to carry out those threats, or at least what was the defendant's belief as to Bevivino's ability to carry them out. Because, if they were not such as to produce in his mind fear that the result threatened would be carried out, then he could not set them up as a defence for his act. . . . . .

I call your attention, now, to the testimony with regard to the confession which is alleged to have been made to Captain Linden after the defendant had been arrested. In many particulars the confession as narrated by Captain Linden, and as reduced to writing, is not different from the testimony given by the defendant upon the stand. There are, however, some important particulars in which they do materially differ, and therefore it becomes our duty to lay down the law to you with regard to the reception of confessions of persons accused of crime.

Where a man freely and voluntarily—that is, without fear or hope of benefit—makes, and intelligently makes, a statement, of course it is evidence of a very high nature. But in order to warrant the admission in evidence of the confession of a person accused of a crime, it must appear, in the first instance, that it was free and voluntary, and was not wrung from him by fear, or by hope that he would be bettered or advantaged thereby. That is, the inducement for the confession must not be the promise made to him, or hope held out to him, that it would be better for him to confess, by any person having authority. According to the evidence of Captain Linden, the defendant was in the company of his under officer, Thayer, and while in his company, Thayer made statements to the defendant as to the propriety of his making a confession to Captain Linden, and as to the advantage which would accrue to him if he did make such a confession, which, if they had been the inducement for the confession, would have required us to reject it from evidence. A promise by an officer to a person in charge, that it would be better

for him in the end to confess and tell what he knows, is such a promise as prevents the reception of the confession in evidence. But in order to warrant the rejection of a confession upon the ground that it was induced by a promise, it must appear that the promise was the inducement to the making of the confession. If, therefore, the promise or inducement which had been held out by Thayer, was not the inducement which led the defendant to make the confession, then it would be admissible in evidence. Upon this question there is a conflict of evidence. In the first instance, it was the duty of the court to decide as to its admissibility, and, acting within the province committed to us, we decided that it was admissible, and it was read in your hearing. But the defendant says that after he had returned from Thayer's room, Captain Linden then made promises to him as to what would be the advantage to him if he told all that he knew. On the other hand you have the testimony of Captain Linden to the effect that he then cautioned him that he could make no promises to him, and that if he told him anything he must tell him the truth, and with the knowledge that he would use it against him. Now, if this had the effect of removing from the defendant's mind the hope which may have been born there by what Thayer had said, then we cannot say that this was not a free and voluntary confession. It is for you to determine, then, whether the confession made to Captain Linden was a free and voluntary one, under the instructions we have given to you upon this question of law, or whether it was induced by the hope that he would be advantaged by making it, and that this hope was caused by promises held out by the officer in charge. In case you should find that it was not a free and voluntary confession, then you will reject it from consideration. This applies, however, only to what was said to Captain Linden, and to what was done with regard to the confession itself. It would not operate to the rejection of the testimony as to what he and Captain Linden did after they got to Wilkes-Barre that night, with regard to finding the property which had been hidden in the woods above Miner's Mills. That would be evidence in any view of the case. In case you should decide that this confession was free and voluntary, then you will remember the testimony as to what took place the night that

Charge of Court below.

they had the first interview, and also what was reduced to writing the next day. You are, in view of the discrepancy between that and the testimony, in some particulars, given here upon the stand by the defendant, to consider whether or not it is correctly reported. Have the statements made by the defendant at that time been correctly, accurately reported? Has anything been omitted from that statement which would tend to qualify it or put a different light upon it? Has anything been interjected into that statement which was not said by the defendant? In deciding this question, you are to consider all of the circumstances. You are to consider also the testimony as to the care with which it was prepared—the care exercised not only by the officers but by the defendant himself.

Now, gentlemen of the jury, our duty as far as the trial of this case is concerned is ended. . . . .

On February 11, 1889, the jury returned a verdict that the prisoner was guilty of murder in the first degree.

On February 25, 1889, a rule for a new trial was discharged, "and the prisoner, Michael Rizzolo, is called before the court and asked if he has anything to say why sentence should not be pronounced upon him, and he replied that he had nothing to say." Judgment was then passed that the prisoner be executed. Thereupon the prisoner took this writ, specifying that the court erred:

1, 2. In refusing a change of venue, and in refusing to grant a rule to take testimony to prove the facts alleged in the petition.[1] [2]

3, 4. In disallowing the motions to quash the array of jurors and the indictment.[3] [4]

5. In disallowing the challenges for cause made to the following persons called as jurors and sworn on their voir dire.[5]

6, 7. In admitting in evidence (under exception) the testimony of Captain R. J. Linden, detailing the alleged confession made to him by the defendant in Philadelphia, and in admitting in evidence the alleged written confession of the defendant.[6] [7]

8–12. In the parts of the charge embraced in [ ] [8 to 12]

16. The record does not show that the prisoner was asked whether he had anything to say why sentence of death should not be passed against him.

Arguments.

*Mr. Edward A. Lynch* and *Mr. John Garman,* for the plaintiff in error: .

1. A defendant in a capital case, making his application in pursuance of § 1, act of March 18, 1875, P. L. 30, is entitled to a reasonable time to show cause, if any he have, to the satisfaction of the court, why the venue in his case should not be changed: Newlin's Petition, 123 Pa. 541; People v. Lee, 5 Cal. 355; People v. Bodine, 7 Hill 181; Commonwealth v. Ralph, 111 Pa. 365.

2. In pursuance of § 2, act of April 10, 1867, P. L. 62, the court below at November Term 1888, ordered 1550 names as the number of jurors to be selected for the ensuing year. Four names more than were ordered and designated by law were placed in the wheel. The benefit of the statute which the prisoner invokes is due him as a matter of right, without regard to what the officials intended: Clark v. Commonwealth, 29 Pa. 129; Brown v. Commonwealth, 76 Pa. 319; Brown v. Commonwealth, 73 Pa. 321; Scranton City v. Gore, 124 Pa. 595; Commonwealth v. Lippard, 6 S. & R. 394; Jewell v. Commonwealth, 22 Pa. 94; Donaldson v. Commonwealth, 95 Pa. 21.

3. A fair consideration of the testimony of the officers who were instrumental in obtaining the oral and written confessions of the prisoner, will show that the confessions should have been excluded on the ground of undue influence: Whart. Crim. Ev. § 653; Commonwealth v. Smith, 119 Mass. 305; McClain v. Commonwealth, 110 Pa. 263.

4. The defence relied upon by the prisoner was that he did not cause or assist in causing the death of McClure; that he did not know the crime was to be committed; that he came upon the scene that morning accidentally; that from his previous knowledge of Bevivino's nature, the threats that he had made against his life, the frequent and constant assertion that he, Bevivino, belonged to a secret organization, who punished by death the divulging of their plans, the absolute control that this man and his murderous friends obtained over the prisoner's mind through coercion, fear and terror, from the first hint at the crime, totally deprived him of his free agency: 1 Whart. Crim. Law, §§ 94, 389; 1 Archb. Crim. Prac., 52; Rex v. Stratton, 21 Howell's St. Trials, 1223; Tiffany v. Commonwealth, 121 Pa. 165; Meyers v. Commonwealth, 83 Pa. 131; Pannell v. Commonwealth, 86 Pa. 260.

Arguments.

5. That the prisoner should have been asked whether he had anything to say why sentence of death should not be passed upon him, was an important part of the record and could not be omittted: Hamilton v. Commonwealth, 16 Pa. 129; Johnson v. Commonwealth, 115 Pa. 369.

*Mr. Alfred Darte,* District Attorney (with him *Mr. H. A. Fuller, Mr. John T. Lenahan* and *Mr. James L. Lenahan),* for the defendant in error:

1. It was not error to refuse a change of venue, nor to refuse a rule to show cause why such change should not be granted.

A change of venue could not be granted except upon proof of the reasons alleged for the same, "to the satisfaction of the court." The court offered to hear proof forthwith, but no effort was made to comply. The act of 1875 imposes no restriction or limitation upon the discretion of the court, but provides that all applications shall be made "in such manner as the court shall direct."

2. It was not error to disallow the motions to quash the array of jurors and the indictment, on the ground that 1554 names instead of 1550 were placed in the jury wheel.

The certificate of the jury commissioners corroborated by the testimony of one of their number, should not be overturned by parol evidence of a count of the list by one witness. The evidence was contradictory, and the certificate should prevail. Moreover, the objection is frivolous. Had the number been less instead of greater than that designated, there would have some ground for complaint.

3. The court made no error in disallowing the challenges of jurors for cause.

This assignment is incomplete, not specifying the names of the jurors. But in the disposition of the challenges, the court below followed literally Allison v. Commonwealth, 99 Pa. 17.

4. It was not error to admit in evidence the oral and written confessions to R. J. Linden.

The written confession was made and signed two days after the oral confession, when no promise, threat, or inducement was made or alleged to have been made. Afterwards, the question was submitted to the jury with lucid instructions.

5. There was no error made in the charge to the jury. The

evidence was all on one side. The court simply reviewed the evidence, and this necessarily presented the strong points in favor of the commonwealth. The record exhibits compliance with every reasonable requirement. No other sentence except sentence of death could be pronounced upon the verdict recorded. The words, " of death," therefore, would have been surplusage.

OPINION, MR. CHIEF JUSTICE PAXSON :

The first seven assignments of error are not in accordance with the rules of court, and might well be dismissed for this reason alone. But we are not unmindful of the fact that a human life is at stake ; that the defendant below is a friendless man, and a stranger in a strange land. We will consider the alleged errors as though they had been properly assigned.

The defendant moved the court below for a change of venue. In support of this motion his affidavit was filed, setting forth his belief that he could not have a fair trial in the county of Luzerne by reason of the great excitement and prejudice there against him. He therefore asked for a rule to take the testimony of witnesses, to prove the facts alleged in his petition. The court refused to grant the rule, but offered to hear at bar any testimony in support of the petition. The defendant asked for " more time to get the subpœnas, and get the witnesses." This was refused by the court, and very properly. The application was not made until the case was called for trial. It might and should have been made at an earlier period in the term. It was said by the learned judge : " We must decline to postpone it. We think he ought to be prepared now. He has had the whole of this term to make the application, and we think it would make a very bad precedent to lay it down that an application of this kind might be reserved in this way, and a rule granted permitting the taking of testimony thereafter. We think it is the defendant's duty to produce his proofs now, to sustain the petition. We will hear them now." No proofs were offered, and the motion fell. There is no merit in these assignments.

The defendant also moved to quash the indictment, and also the array of jurors. These motions were based upon an alleged irregularity in filling the jury wheel. It appeared that

the order of court for filling the jury wheel for 1889, specified 1550 as the number of names that should be placed therein. It was alleged that the names of 1554 jurors were actually placed in the wheel, being four in excess of the number ordered by the court. A witness was examined who had counted the names on the list, and he stated the number to be 1554. The certificate of the jury commissioners was produced stating that they had placed the proper number, viz. : 1550, in the wheel. One of the said commissioners was examined, and testified that their intention was to put in 1550 names ; that they did so, and had no knowledge of four additional names having been put in. It is very clear that if the wheel did contain 1554 names, it was a mere accident, probably the result of an error in addition, an error which might occur with the most careful and accurate commissioners. It was a mere irregularity, of a harmless nature, and furnishes no ground to quash the array.

It was also alleged that the court erred in disallowing the challenges for cause to certain jurors. The names of the jurors even are not given, but I have gone through the type-written copy of the testimony to ascertain whether the objection was well taken. The challenges were all properly overruled under Allison v. Commonwealth, 99 Pa. 17, and the cases which have followed it. The jurors objected to had all formed opinions of greater or less strength, from what they had read in the newspapers about the murder, but they all said they could render a verdict according to the evidence, uninfluenced by their previously formed opinions. · There was a time when a stricter rule prevailed, and a juror was excluded from the box when he had formed an opinion as to the guilt or innocence of the accused. At that time, intelligent jurors could be found who had formed no opinions in regard to a case, for the reason that they had heard or read little about it. That was before the telegraph and the press brought to every man's door the news of every event and every crime, within a few hours of its occurrence, with full details of everything connected therewith. All this is now changed ; within twenty-four hours of the commission of this murder, it is safe to say that by means of the wire and the press, the details of it had been read by nearly every intelligent man, not only in Luzerne county, but in the

state, and that but few persons had not formed some opinion in regard to it. The law upon this subject has necessarily advanced with the changed circumstances; it has merely kept abreast of the times, and adapted itself to what the common judgment and common sense of the people see is essential to the proper administration of the criminal law. To return now to the old rule, would exclude from the jury box in many instances every man of average intelligence.

We find no error in admitting in evidence the testimony of Captain Linden in regard to the defendant's confession, nor to the admission of the confession itself. His testimony was competent and rebutted any allegation of undue influence in obtaining it. He said to the defendant: "If you have anything to tell me, in God's name tell me the truth; if not, tell me nothing. You have a right to keep your mouth shut. I tell you now, as your lawyer would tell you, I can make you no promise; I cannot even ask you to tell me a word; but I tell you now, anything you say to me I shall use against you. It is my duty to do so. Now, if you feel like telling me anything, go ahead; but tell me nothing or tell me the whole God's truth." In view of this we regard what Thayer said to the defendant as unimportant; and as between the witness and the defendant, we are not surprised the jury believed the former, who was a reputable, disinterested witness, while the latter was testifying with a halter around his neck.

Most of the remaining assignments are made up of extracts from the charge of the court. They are isolated from the charge, but whether we take the charge as a whole or in sections it is free from error. The question whether the defendant was acting under duress or threats on the part of Bevivino was submitted to the jury under proper instructions as to its effect upon the degree of guilt. This appears from that portion of the charge referred to in the ninth assignment, which is as follows: "But in case you should find as a matter of fact that the shots were not inflicted by the defendant, then you will inquire whether or not the acts which he performed there were coerced by fear of Bevivino; whether that explanation which has been given by the defendant is such as would show that he had not the power to form the wilful, deliberate, and premeditated intent to take the life of McClure." We need not pursue this branch of the case further.

There remains but to notice the sixteenth and last assignment, which alleges that "the record does not show that the prisoner was asked whether he had anything to say why sentence of death should not be pronounced against him." The record shows that the defendant was asked if he had anything to say why sentence should not be passed upon him. As no sentence was possible but that of death we think there was no omission. The rule is thus stated by Blackstone, vol. 4, p. 376: "For when, upon a capital charge, the jury have brought in their verdict of guilty, in the presence of the prisoner, he is either immediately, or at a convenient time soon after, asked by the court if he has anything to offer why judgment should not be awarded against him."

This defendant has had all the advantages which our humane system of laws afford; with no claim except that of common humanity, he was assigned, without cost to himself, able counsel to defend him, who have performed that duty with zeal and ability, not only without fee or reward, but without the hope or expectation of any; his case was tried before an impartial jury by a learned and able court, not only without error, but with conspicuous care and impartiality, and after a verdict of guilty he has had his case reviewed in the highest court in the state. He was allowed to be heard here in forma pauperis, to save him the cost of printing the testimony. It was his misfortune that a chain of testimony, in addition to his own confession, pointed to him with terrible distinctness as one of the perpetrators of a cold-blooded, mercenary murder.

The judgment is affirmed, and it is now ordered that the record be remitted to the court below for the purpose of execution.